UNITED STATES of America,

v.

Paul W. MOZER, Defendant.

No. S1 93 Cr. 0006(PNL).

United States District Court, S.D. New York.

July 27, 1993.

As Amended July 29, 1993.

Matthew E. Fishbein, Acting U.S. Atty. S.D. New York, New York City (Laurie Brecher, John W. Auchincloss, II, Asst. U.S. Attys., of counsel), for U.S.

Chadbourne & Parke, New York City (Stanley S. Arkin, Robert J. Hausen, Anthony M. Supino, Randy J. Amster, Barry S. Pollack, of counsel), for defendant.

OPINION AND ORDER

LEVAL, District Judge.

This is a motion by the defendant in a criminal case seeking specific performance of a plea agreement he made with the United States Attorney's Office for the Southern District of New York. Specifically, he seeks to be allowed to plead guilty in accordance with the terms of the agreement and to receive its benefits. The Government opposes the motion.

The Government contends first that the plea bargain agreement was nothing more than an offer of unilateral contract and as such did not impose any binding obligations on the Government until the defendant "accepted" by his timely entry of a guilty plea; the Government argues that until the defendant's entry of a plea under the agreement, the Government was free to withdraw its offer at any time for any reason. Second, the Government contends that because the time allowed for the defendant's "acceptance" under the agreement has expired, he can no longer do so, and the court cannot resuscitate the lapsed agreement. Finally, the Government contends that the defendant breached the terms of the plea agreement and thus repudiated it. The Court finds to the contrary that it is the Government that acted inconsistently with the terms of the plea agreement and that the defendant is entitled to the relief he seeks.[1]

### Background

Defendant Paul Mozer was a managing director of Salomon Brothers Inc., a New York investment bank, and was the head of Salomon's Government Trading Desk. As a primary dealer in U.S. Treasury securities, Salomon regularly purchased such securities in the Treasury's auctions. Under Treasury rules, one entity may purchase no more than 35% of the total amount of securities offered in an auction, and may bid for no more than 35% of the amount at auction at any one yield level.

In the fall of 1992, the Department of Justice, at the instance of the Treasury Department, was investigating whether Salomon had violated these Treasury rules in a February 1991 auction by submitting multiple 35% bids in dummy names and thus, after proration of the bids, receiving aggregate allocations that exceeded the maximum of 35% allowed. Separate investigations were being conducted by the Office of the United States Attorney for the Southern District of New York ("SDNY") and the Antitrust Division of the Department of Justice. It appears that Mozer cooperated with SDNY's investigation and negotiated for a plea agreement.

On November 19, 1992, after his cooperation and following extensive negotiations, Mozer entered into a plea agreement with the SDNY Office (the "Agreement"). The Agreement provided that the SDNY Office "will accept" a guilty plea from Mozer, entered "no later than December 3, 1992," to an information charging him with two counts of "making, and aiding and abetting the making of, false statements within the jurisdiction of an agency of the United States," in violation of 18 U.S.C. §§ 1001 and 2; and that in return for such plea, he would not be further prosecuted *by SDNY* for any crimes he committed related to his participation in Treasury auctions during a specified period. It went on to specify certain agreements as to application of the Sentencing Guidelines and to provide that the Government would move under § 5K1.1 of the Guidelines for a downward departure in Mozer's sentence by reason of the defendant's prior cooperation. The Agreement also emphasized in customary language that the undertaking that Mozer would not be prosecuted further bound only the SDNY office and did not bind "other federal, state or local prosecuting authorities." It then added an unusual provision, as follows:

> The parties understand that Paul Mozer intends to claim that certain other prosecuting authorities are barred from further prosecuting him for conduct relating to U.S. Treasury securities by alleged prior agreements between Paul Mozer and such authorities. Although the Office believes that such a claim is without merit, the parties agree that nothing in this Agreement should be construed so as to prevent Paul Mozer from raising such a claim in any future proceedings brought by such other prosecuting authorities.

1. The court notes that the Honorable Mary Jo White, who recently became United States Attorney for the Southern District of New York, played no role in this action. All of the material events had occurred prior to her appointment; furthermore, upon her appointment, she recused herself for personal reasons from any participation in this action. Matthew E. Fishbein, who is now Acting United States Attorney in this matter, also played no role in the events discussed herein.

The Agreement also included a conventional integration clause.[2] Nothing in the plea agreement addressed the specific form or content of the information to which Mozer would plead.

On December 3, 1992, the last day provided for Mozer to enter his plea under the Agreement, the parties signed an amending letter, extending the Agreement "to provide that Paul W. Mozer will enter ... guilty pleas on or before January 7, 1993."

Sometime in the weeks after that letter was signed, disputes arose between the SDNY Office and Mozer. On January 5, 1993, when Mozer's counsel, Stanley Arkin, Esq., first saw SDNY's draft of the information to be filed against Mozer, he objected to certain language in the draft. His objection had two prongs, as follows. Section 1001 of Title 18 covers three categories of conduct: (1) falsification, concealment, and covering up by any trick, scheme, or device; (2) making a false or fraudulent statement; and (3) making or using a false writing. The information as drafted charged Mozer with all three theories. The plea agreement referred to only one of the three—"making ... false statements." Arkin contended that the information charging all three theories of § 1001 violated the agreement that he would plead to an information "charging him ... with making ... false statements ... in violation of ... Section 1001...." Second, Arkin protested the inclusion in the information of narrative language asserting that Mozer had attempted to cover up Salomon's false bids *after* the February 1991 Treasury auction. The SDNY Office refused to remove this language from the information, or to limit its charges to the false statements branch of § 1001.

On the evening of January 6, 1993, with Mozer's arraignment on the two-count infor-

mation scheduled for the next day, Mozer's attorneys telecopied to the SDNY Office copies of Mozer's draft Motion for Expedition and Motion to Strike and for Specific Performance, with supporting affidavit and memorandum of law. The motion for specific performance contended that the information drafted by SDNY was not consistent with the Agreement; it sought to enforce the terms of the Agreement. The accompanying letter stated that, "Mr. Mozer stands ready and willing to perform his obligations under the Plea Agreement."

On January 7, 1993, the SDNY Office filed the two-count information including the language to which Arkin had objected. Mozer was arraigned before a magistrate judge and waived his right to prosecution by indictment. The case was assigned to Judge Robert P. Patterson. At this time, representatives of the SDNY Office apparently told Mozer's counsel that if Mozer did not wish to plead to the information *as filed,* the Office would treat this as his repudiation of the Agreement and would proceed to present an indictment going beyond the limited immunity conferred by the Agreement.[3]

The parties proceeded to Judge Patterson's chambers, with Mozer apparently intending to enter a plea of guilty to the two-count information. However, because Judge Patterson was occupied in another matter, the parties were told to come back on January 11, 1993.

On January 8, 1993, Mozer filed his Motion for Expedition and a Motion to Strike and for Specific Performance; the SDNY filed responsive papers. A conference was held before Judge Patterson on January 11.

At the first part of the conference on January 11, 1993, Judge Patterson expressed con-

---

**2.** The clause provided:

> With respect to this matter, this Agreement supersedes all prior, if any, understandings, promises and/or conditions between this Office and Paul Mozer. No additional promises, agreements, and conditions have been entered into other than those set forth in this letter and the accompanying Annex A [concerning Sentencing Guidelines calculations] and none will be entered into unless in writing and signed by all parties.

**3.** This statement was repeated in an affidavit immediately filed by the Office in response to Mozer's motions. *See* Brecher Aff. of January 7, 199[3] ¶ 11 ("If Mozer does not wish to plead to the Information as filed, the Government is prepared to accept it as a repudiation of the Plea Agreement by Mozer, and to proceed against him by way of indictment.").

cern that Mozer's objections concerning the content of the filed information indicated that the parties did not really have "a meeting of the minds" concerning the plea. He stated that the parties would "have to be in agreement as to what this agreement means or we take no plea." Several times during the colloquy, the defendant made clear that, despite his motion to strike language in the information, he was willing to plead to the information as drafted and to make a legally sufficient allocution. The Assistant United States Attorney responded that the Government would accept a legally sufficient allocution.

However, the judge then raised a question as to what would happen in the event of a future prosecution of Mozer for antitrust violations if Mozer contended that such a prosecution was barred by the Agreement. Mr. Arkin first noted, and the Assistant agreed, that in the Agreement the parties had essentially agreed to disagree on this issue: as quoted above, the Agreement stated that Mozer was free to argue that other governmental authorities were barred from prosecuting him by reason of other agreements.

Arkin then stated that, should an antitrust prosecution of Mozer occur in the future, he might call Assistant U.S. Attorneys as witnesses to support the contention that Assistants might have carried messages on behalf of the Antitrust Division that conveyed the making of an agreement with the Antitrust Division. The Assistant U.S. Attorney asserted that the defendant had no right to do so under the Agreement and stated that, given Arkin's contention, there was no meeting of the minds and therefore no plea agreement. The Assistant stated that, in light of Arkin's contention, the SDNY Office would proceed against Mozer by way of indictment.

As the day's proceedings concluded, Judge Patterson was persuaded by the Government's arguments to doubt whether there existed a true agreement and he therefore declined to accept a plea from Mozer at that time.

The next day, January 12, 1993, the SDNY Office filed a four-count indictment against Mozer, going beyond the areas of prosecution provided for in the plea agreement. Mozer's counsel filed new papers seeking specific performance of his right to enter a plea under the Agreement, and the Government filed responsive papers. Further arguments were held before Judge Patterson on February 1, 1993. On February 7, 1993, Judge Patterson recused himself, and the case was then assigned to this judge.

*Discussion*

The Government advances three arguments in support of its contention that the plea agreement should not now be enforced: that the defendant repudiated the Agreement by making motions and taking positions that were incompatible with the terms of the Agreement; that the Agreement lapsed by its own terms when the defendant failed to enter his plea by the final date permitted; and that, in any event, the Government is free to rescind such a plea agreement at any time before the defendant accepts the Government's offer by entering his plea.

■ 1. As to the Government's first contention, I find that it is not the defendant, but the Government that took positions incompatible with the Agreement. This the Government did not once, but three times.

· First, when Mr. Arkin moved to strike certain language and certain theories from the information, the Government charged the defendant with repudiation of the plea agreement. It contended that the defendant's undertaking to plead to an information charging violations of § 1001 required him to accept whatever charging language the Government included, and that his motion to strike language constituted a repudiation of the Agreement.

There is absolutely no basis for this argument. Nothing in the plea agreement purports to limit the defendant's right to protest the inclusion of inappropriate prejudicial language in the charging instrument. What is more, one of the two theories advanced by Mr. Arkin in the motion to strike has considerable merit. As noted, the Agreement called for a plea to an information charging the defendant with "making ... false statements" in violation of § 1001. That statute, as noted above, covers three types of conduct

including, in addition to making false statements, concealing by trick and using false documents. The instrument drafted by the Government charged the defendant under all three theories, rather than limiting itself to the one named in the Agreement. The defendant's protest surely has at least colorable merit. The Government answers that Section 1001 is colloquially known as the "false statements" section and that the reference in the plea agreement therefore meant only to identify the statute and not to specify a restriction to one of its theories. *Cf., e.g. United States v. Bilzerian,* 926 F.2d 1285, 1299 (2d Cir.) (referring to § 1001 as "the general false statements statute," in contrast to "the more specific securities law provisions"), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). While this may indeed have been what the Government intended when it drafted the agreement, it is scarcely unreasonable for the defendant to read literally the language presented to him and to expect compliance with its literal terms. What matters here, however, is not which side is correct as to the permissible charging theories. Even if the Government is right that the Agreement should be read to permit a charge alleging all three theories of § 1001, there is absolutely no justification under the Agreement for the Government's contention that the defendant repudiated the Agreement by advancing his argument and asking that the information be restricted to the "false statement" theory of § 1001.[4]

■ The Government's next theory of repudiation is equally without merit. This theory is based on Mr. Arkin's statement, when questioned by Judge Patterson as to what the defendant would do if prosecuted by the Antitrust Division, that he might call former and current members of the SDNY Office to testify that they had transmitted messages on behalf of the Antitrust Division through which Mozer had concluded an immunity agreement with the Antitrust Division. The Government then took the position before Judge Patterson that the defendant had no right to proceed in this fashion under the Agreement, that his announcement of intention to do so showed that there was no agreement, and that the Government would therefore proceed to file an indictment. In its papers on this motion, the Government contends that the defendant repudiated the Agreement by taking this position.

The Government's position is altogether without basis. In the first place, even if the Government were correct that the plea agreement barred the defendant from calling Assistants in the SDNY Office as witnesses, his announcing an intention to do so would still not have represented a repudiation. The remedy would simply have been, in the event the defendant were prosecuted by the Antitrust Division and sought to call Assistants as witnesses in the manner stated, to point out to the Court at such time that the defendant was barred from doing so by his earlier plea agreement.

---

4. As to the second branch of the defendant's motion to strike, I would have ruled against the defendant. There is no reason why the charging language should not have included the allegation of subsequent efforts to cover up fraudulent conduct. Evidence of such conduct would certainly have been admissible to show fraudulent intent, and therefore could properly be included in the charging instrument. *See, e.g., United States v. Ianniello,* 621 F.Supp. 1455, 1479 (S.D.N.Y. 1985) (Weinfeld, J.) ("If the evidence of the allegation is admissible and relevant to the charge, then it will not be stricken, regardless of its prejudicial effect."), *aff'd,* 808 F.2d 184 (2d Cir. 1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987); *United States v. Esposito,* 423 F.Supp. 908, 911 (S.D.N.Y.1976) (Weinfeld, J.) (indictment may properly include any allegation that is "relevant to the case and will constitute part of the government's proof at

trial"); *United States v. Ruiz,* 702 F.Supp. 1066, 1073 (S.D.N.Y.1989).

Nonetheless, there is still no basis for the Government's contention that the defendant repudiated the Agreement by moving to strike the language. The contention that, in agreeing to plead to an information charging a specific crime, the defendant has committed himself to accept whatever language the Government might choose to include in the charge has no reasonable basis. If, for example, the instrument had included language accusing the defendant of molesting animals in the park, he would surely have been entitled, notwithstanding the Agreement, to move to strike the prejudicial language. As to the part of the motion that lacked justification, the motion would simply be denied, leaving the defendant free either to accept the offer of plea bargain by pleading guilty to the information or to decline to do so and face a broader indictment.

■ Furthermore, the Agreement itself contains no support for the Government's position. The Agreement expressly preserves for the defendant the right "to claim that certain other prosecuting authorities are barred from further prosecuting him ... by alleged prior agreements between Paul Mozer and such authorities." The Agreement then states that "[a]lthough the [SDNY] Office believes that such a claim is without merit, the parties agree that nothing in this Agreement should be construed so as to prevent Paul Mozer from raising such a claim in any future proceedings brought by such other prosecuting authorities." The Agreement suggests no limitation on how Mozer can undertake to prove such further agreements. There is no suggestion that he is barred from claiming that Assistants from the SDNY Office carried messages between Mozer and the Antitrust Division by which such agreements were formed. Nor does it suggest that he is barred from calling SDNY Assistants as witnesses in his effort to establish such agreements. In short, the Agreement is totally devoid of any support for the Government's position; on its face, the Agreement clearly and unambiguously supports the defendant's entitlement to proceed in the manner he described in his effort to prove such an agreement with the Antitrust Division.

The Government goes on to contend that Mozer is barred from proceeding in this fashion because he had raised this intention in the negotiations prior to the Agreement and had been told that such an intention was unacceptable to the Government. The Government contends that Mozer's subsequent signing of the proffered Agreement reflects his acceptance of the Government's terms. This contention completely disregards the integration clause which the Government inserted in the Agreement. This clause provides that the Agreement "supersedes all prior, if any, understandings, promises and/or conditions" between the parties and rules out any "additional promises, agreements, and conditions ... other than those set forth in this letter ... unless in writing and signed by all the parties." It is elementary contract law that, absent fraud, a party to a contract may not rely on such prior discussions to contradict the unambiguous

terms of a contract, especially in the face of an integration clause. *See generally* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 3–10, at 166–67 (3d ed. 1987) ("if a writing ... appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature") (citing cases); 4 Samuel Williston, *A Treatise on the Law of Contracts* § 601, at 310–11 (Walter H.E. Jaeger ed., 3d ed. 1961); *id.* § 631, at 949; *id.* § 646; *see also United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992) ("It is a fundamental principle of contract interpretation that extrinsic evidence is inadmissible to prove the meaning of a contract that is unambiguous on its face.") (citing cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 1616, 123 L.Ed.2d 176 (1993).

I conclude there is no merit to the Government's contention that the defendant repudiated the Agreement. To the contrary, it is the Government that repeatedly took positions incompatible with the Agreement it had drafted.

2. The Government next contends that the Agreement lapsed. The Agreement as originally drafted required the defendant to plead by December 3, 1992, if he wished to take advantage of the offer. This limitation was extended by letter to January 7, 1993. The Government acknowledges that it implicitly consented to a further extension to January 11, 1993, the first date when Judge Patterson could see the parties. The Government contends, however, that when January 11 passed without a plea having been entered, the Agreement lapsed so that no continuing basis exists for Mozer's motion for specific performance.

This argument would have considerable force if the defendant had simply failed to offer his plea within the time permitted. In fact, however, the defendant offered his plea; it was the Government that effectively prevented the defendant from entering his plea by making arguments to the judge that were inconsistent with the Agreement. It appears that the Government had become irked by the defendant's independent and uncooperative attitude. Ordinarily, defendants who have cooperation agreements with the Government are submissive; they cannot afford

to alienate the prosecutor because the sentencing court's ability to depart from a mandatory minimum sentence or a Sentencing Guideline depends on the Government's willingness to make a motion for departure under 18 U.S.C. § 3553(e) or § 5K1.1 of the Guidelines. This defendant, for whatever reason, was apparently worrying less about pleasing the prosecutor and more about protecting his flank from exposure to further prosecution by the Antitrust Division and potential civil liabilities. The Government, apparently believing that the Agreement and the defendant's earlier cooperation gave it an entitlement to a cooperative defendant, regarded his confrontational attitude and his abrasive making of motions and arguments as repudiation of the Agreement. As noted above, there was no basis for this position. There was nothing in the Agreement that precluded the defendant from making such motions. When the defendant challenged the language of the information, however, the Government, fed up with this independence, repeatedly asserted to Judge Patterson at the January 11 conference that the Agreement was illusory and repudiated. When so threatened, the defendant restated several times his readiness to plead to the information as drafted. The issue became critical, however, when the judge undertook to explore what would happen in the event of a prosecution by the Antitrust Division. When Mr. Arkin revealed his intention to call former and current members of the SDNY Office as witnesses in an effort to establish that they had carried messages from the Antitrust Division constituting an agreement, the Government inappropriately told the judge that Mr. Arkin's position showed there was no agreement. Judge Patterson, having had little opportunity to familiarize himself with this unusual agreement—in which the defendant expressly preserved the right to contend in the future that he had made an immunity agreement with another prosecuting authority—was led by the Government's unjustified arguments to doubt the existence of a binding agreement. As a result, the judge declined to accept at that time the plea that the defendant was proffering. This was not appropriate conduct by the Government. The positions asserted by the Government had no justification whatsoever under the Agreement.

Having thus convinced the judge that he should decline to accept the plea, the Government cannot be heard now to claim that the defendant's failure to plead by January 11 resulted in his loss of the rights he had negotiated under the Agreement. The Government does not contend it has been prejudiced in any way by the passage of the January 11 date. All the delay since January 11 has been attributable to the schedules of Judge Patterson and this judge; I do not believe this delay should prevent Mozer from obtaining the benefits of the bargain that he had contracted for with the Government.

█ 3. The Government's third argument is that, having made the defendant an offer of unilateral contract which he could accept only by pleading guilty, it was free to withdraw the offer at any time prior to its acceptance. The Government points out that the defendant neither accepted the offer, nor relied on it to his detriment, nor furnished consideration. The defendant's cooperation was rendered to the Government before the Agreement was made; it was therefore not rendered in reliance on the Agreement. If the Government was free to withdraw the offer, it argues, it cannot be held to specific performance.

The Government cites a number of authorities that generally support its right to withdraw from a plea agreement prior to the entry of a guilty plea. *See, e.g., United States v. Gonzalez*, 918 F.2d 1129, 1133–34 (3d Cir.1990), *cert. denied*, 498 U.S. 1107, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991); *United States v. Papaleo*, 853 F.2d 16, 17–20 (1st Cir.1988); *United States v. Ocanas*, 628 F.2d 353, 358 (5th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981); *Government of Virgin Islands v. Scotland*, 614 F.2d 360, 361–62 (3d Cir.1980); *United States v. McGovern*, 822 F.2d 739, 744 (8th Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 352, 98 L.Ed.2d 377 (1987); *United States v. Alvarado–Arriola*, 742 F.2d 1143, 1145 (9th Cir.1984); *see also United States v. Carbone*, 739 F.2d 45, 46 (2d Cir.1984) (dictum). *But see United States v. Smith*, 648 F.Supp. 495, 498 (S.D.Tex.1986) (enforcing plea agreement before plea entered); *United States v. Lieber*, 473 F.Supp. 884 (E.D.N.Y.1979) (same). I do not dispute the authority of those cases

for the proposition that the Government may generally withdraw an unaccepted offer of plea bargain, particularly where it does so for some legitimate law enforcement reason. Thus, for example, if the Government learns additional negative information about a defendant which leads it to reassess whether the offer of plea bargain is in the best interests of the Government, and the defendant has not relied on the assurance that the offer will remain available, the Government may retract the unaccepted offer. *See, e.g., United States v. Ocanas,* 628 F.2d 353, 356–58 (5th Cir.1980) (government filed superseding indictment charging larger and longer conspiracy), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981), *explained in United States v. Smith,* 648 F.Supp. 495, 498 (S.D.Tex.1986) ("The additional information in the superseding indictment [in *Ocanas*] reasonably changed the Government's position with respect to the plea agreement and formed the basis for the Government's decision to withdraw the plea agreement."); *United States v. Papaleo,* 853 F.2d at 18 n. 1 (defendant intended to commit perjury when testifying pursuant to plea agreement); *see also Government of Virgin Islands v. Scotland,* 614 F.2d at 361–62 (defendant declined to testify for government in accordance with plea agreement); *United States v. Gonzalez,* 918 F.2d at 1133–34 (government offer of plea agreement was contingent on all three defendants accepting, and one declined); *United States v. Coon,* 805 F.2d 822, 825 (8th Cir.1986) (parties discovered that maximum statutory fine much higher than thought at time of entering plea agreement).

Regardless whether the Government might have been free to revoke the offer of plea bargain for such legitimate law enforcement reasons, that is not what the Government did here. What it did, as noted above, was to wrongly accuse the defendant of having repudiated the Agreement and, thus, to convince the judge not to accept the defendant's proffered plea.[5]

The Government has pointed to absolutely no reason why the plea agreement was any less in the public interest on January 11, 1993, than it was on the November 19, 1992, when it was made. There was no valid reason to withhold from the defendant the opportunity to enter his plea in acceptance of the agreement, thus obtaining the benefits of the limited immunity for which he had successfully negotiated.

Although the Government's briefs treat this motion in the manner of a commercial contract dispute, courts have consistently made clear that a prosecutor entering into a plea bargain agreement is not simply a party to a contract. The Government is required to observe high standards of integrity and honorable conduct, and the supervisory power of the court is designed to insure that such standards are observed. *See United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983); *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). As the Second Circuit has explained, "Comparing a criminal defendant with a merchant in the marketplace is an inappropriate analogy that we have rejected. The law of commercial contracts plays only a limited role in resolving a plea dispute." *Innes v. Dalsheim,* 864 F.2d 974, 978 (2d Cir.1988) (citing *United States ex rel. Selikoff v. Commissioner of Correction,* 524 F.2d 650, 654 (2d Cir.1975)), *cert. denied,* 493 U.S. 809, 110 S.Ct. 50, 107 L.Ed.2d 19 (1989). "Unlike contracts, Plea Bargains involve a myriad of collateral considerations such as expectations of fundamental fairness by the Defendants, efficient administration of justice, and the integrity of the Government's promises." *United States v. Smith,* 648 F.Supp. at 498; *see, e.g., United States v. McGovern,* 822 F.2d at 743 ("A plea agreement, however, is not simply a contract between two parties. It necessarily implicates the integrity of the criminal justice system and requires the courts to exercise

---

**5.** The Government protests that it did not act in bad faith or intend to mislead Judge Patterson. The court does not dispute this assertion. The point is, however, that regardless of motivation, the Government's representations and arguments had *the effect* of misleading the judge and depriving the defendant of the opportunity to plead within the time allowed.

The court recognizes, furthermore, that, in all the actions discussed, the particular Assistant United States Attorneys who appeared on behalf of the Government were acting with the approval, and at the direction, of the then United States Attorney.

judicial authority in considering the plea agreement. . . .") (citation omitted); *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978) ("A plea agreement is not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language."). Consistent with this view, courts have emphasized that "the most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining." *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973); *accord United States v. Fields*, 766 F.2d 1161, 1167 (7th Cir.1985); *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978).

\* \* \*

I conclude that the defendant must be allowed to enter a plea promptly under the terms of the plea Agreement. The motion is granted.

SO ORDERED.