UNITED STATES of America, Appellee,

v.

Gregory GRAVES, Defendant–Appellant.

Docket No. 02–1015.

United States Court of Appeals, Second Circuit.

Argued: April 14, 2004.

Decided: July 6, 2004.

David G. Jay, Buffalo, N.Y., for Defendant–Appellant.

Stephan J. Baczynski, Asst. U.S. Atty., Buffalo, N.Y. (Michael A. Battle, U.S. Atty., Bret A. Puscheck, Asst. U.S. Atty., Buffalo, N.Y., on the brief), for Appellee.

Before: NEWMAN, KEARSE, and KATZMANN, Circuit Judges.

NEWMAN, Circuit Judge.

This appeal illustrates the importance of including in a written plea agreement the entirety of the understanding between the prosecutor and the defendant—a message we have previously communicated with apparent lack of success. *See United States v. Miller*, 993 F.2d 16, 20 (2d Cir.1993). Defendant–Appellant Gregory Graves appeals from the judg-

ment of conviction pursuant to a plea agreement entered in the United States District Court for the Western District of New York (Michael A. Telesca, District Judge) on December 14, 2001. Graves contends that the District Court erred in denying his motion to withdraw his guilty plea. He argues that the plea agreement held out the prospect of a "5K1.1 letter," see U.S.S.G. § 5K1.1, in return for his cooperation and that the Government prevented his rendering the required cooperation by opposing his release prior to sentencing. The Government acknowledges that something was said concerning cooperation that is not included in the written plea agreement, but the details are in dispute. Because of the possibility that the prosecutor, or a Government agent acting on his behalf, made a promise that the prosecutor did not intend to keep and this promise induced the plea agreement, we remand for a hearing to determine whether the agreement was improperly obtained.

## Background

Graves was indicted for narcotics offenses, in violation of 18 U.S.C. §§ 841(a)(1), 844(a). Because of Graves's criminal record, he faced a mandatory minimum sentence of 20 years and a likely sentence of 25 or 26 years under the Sentencing Guidelines. Three consecutive attorneys appearing on Graves's behalf attempted unsuccessfully to negotiate a plea agreement. Ultimately, the Government agreed with Graves's fourth attorney, John E. Bernacki, Jr., that Graves could satisfy the charges against him by pleading guilty to one count of a firearms violation and the Court would sentence him to 15 years' imprisonment, pursuant to Fed.R.Crim.P. 11(e)(1)(C).

*The written plea agreement.* The principal provisions of Graves's written plea agreement concerned the calculation of the sentence, the Defendant's cooperation, and a waiver of appeal. The 15–year sentence was to be arrived at by starting with the mandatory minimum 5–year sentence required for a violation of 18 U.S.C. § 924(c)(1) and adding a 10–year upward departure.

The cooperation section of the agreement spanned four and one-half pages. The Defendant agreed to cooperate with the Government and with state and local authorities designated by the Government. Cooperation was to be accomplished by the Defendant's providing complete and truthful information regarding his knowledge of criminal activity and by testifying to the extent deemed necessary by the Government. The Government agreed to inform the District Court at sentencing about the "nature and extent" of the Defendant's cooperation. The cooperation section of the agreement contained no language as to whether the Defendant would be asked or required to acquire new information about criminal activity by acting as an informant, nor as to whether the Government would move, or consider moving, for a 5K1.1 departure for rendering substantial assistance.

The agreement included a waiver of the Defendant's right to appeal and to collaterally attack his sentence if he received a sentence of fifteen years.

Finally, the agreement included an integration clause, stating that the written agreement "represent[ed] the total agreement between the defendant ... and the government," that "[t]here [were] no promises made by anyone other than those contained in [the] agreement," and that the written agreement "supersede[d] any other prior agreements, written or oral, entered into between the government and the defendant."

*Guilty plea proceedings.* On May 14, 2001, the District Court approved the ne-

gotiated plea agreement and accepted Graves's guilty plea. During the plea allocution, the prosecutor stated that there was a "5K aspect to the plea agreement." The prosecutor explained that "[i]f the Court agrees to the fifteen years, there is the possibility that in terms of the numbers, if there's a 5K motion, [the sentence] could be less than the fifteen years." He later asked that the plea agreement be sealed "because of the 5K provisions."

Later during the plea proceeding, the Court gave the Defendant the following explanation of the cooperation section of the plea agreement:

> [The plea agreement] provides for your cooperation. Should you cooperate to the satisfaction of the government and provide substantial assistance to the government through your cooperation then the government will move for a downward departure under Rule 5K of the sentencing guidelines and ask that I impose a lower sentence.
>
> Understand, sir, that the government is not obligated under this agreement to do that, but will do so only if you have given substantial assistance and cooperation to the government.

After ascertaining that Graves understood what had just been said, the Court told him, "So it's really up to you."

After satisfying the requirements of Fed.R.Crim.P. 11(b), the District Court accepted Graves's guilty plea and set a date for sentencing.

*Attempt to withdraw guilty plea.* On October 2, 2001, Graves moved to withdraw his guilty plea, a motion the Government explicitly declined to oppose. Graves's ground for his motion was that the Government was "not holding up to the end of their bargain." Graves stated, "I've cooperated with everything they've asked me for, and—I cooperated and they said

it's not substantial for reasons I know not . . . ." The prosecutor informed the Court that "[Graves] did sit down and proffer" and that "[t]he information provided was at least in our estimation good, fruitful information."

However, other portions of the prosecutor's explanation to the Court shed some light on why the Government ultimately decided not to make a motion for a 5K1.1 departure motion and also indicated why Graves might have thought the prosecutors were not "holding up [their] end of their bargain." The prosecutor stated:

> We were very clear at the time the plea was taken that there was a very slim likelihood that Mr. Graves would be released or that we would not oppose his release so there could be proactive cooperation.
>
> . . .
>
> However, we assessed that [proffered] information in light of his custody status, and it was determined that we would not be in a position to make a motion or petition the Court for his release.
>
> Given that situation, the information that he provided was not of such a historical [*sic*] nature that it was going to assist us to a substantial degree in pursuing other prosecutions.

Thereafter, the District Court permitted Bernacki to withdraw as defense counsel and replaced him with William Clauss, the Federal Public Defender. Clauss then filed a written motion to withdraw the guilty plea, alleging that the plea was "neither knowing nor voluntary." The motion alleged that Graves had pled guilty "only because he was advised that his actual sentence would be far less than fifteen years." When the District Judge confronted Clauss with provisions of the written plea agreement specifying a sentence of fifteen years, Clauss replied:

Mr. Graves says, however, that he was advised by previous counsel that though the plea agreement did say that[,] that everybody—including the government's attorney—held open the possibility that despite the literal language of the plea agreement[,] there was not just a possibility, but a probability that Mr. Graves would receive less than fifteen years.[1]

Later in the hearing this exchange occurred:

MR. CLAUSS: It's clear to me, Judge—I'm sure Mr. Puscheck [the prosecutor] will correct me if I'm wrong—that there was at least some understanding between Mr. Bernacki and Mr. Puscheck that the possible sentence could be less than fifteen years.

THE COURT: Mr. Puscheck

MR. PUSCHECK: Yes, Judge that's correct.

I mean, there was a 5K aspect to the plea agreement. That was gone over at the plea. You have the transcript.

Again—I mean, it was a possibility.

THE COURT: What happened to the possibility?

MR. PUSCHECK: It just didn't come to fruition. The main stumbling block here, Judge, was that the information that the [local] police were excited about would have necessitated Mr. Graves being released so that it could be proactive cooperation.

It was explained quite clearly to counsel that that was a long shot that he was going to be released, but it was nevertheless a possibility if the information outweighed the risk.

THE COURT: Let me understand something. If he had been released, would he have been of more value to the

government; could he have done himself more good if he had been released?

MR. PUSCHECK: That probability exists, yes.

THE COURT: But you never moved for his release.

MR. PUSCHECK: No. We never promised we were going to move for his release.

THE COURT: What did you tell him during the course of the debriefing?

MR. PUSCHECK: I was not present for either of the debriefings.

The reason I don't sit in on debriefings is exactly for this—

THE COURT: For this reason?

MR. PUSCHECK:—this type of circumstance, so it never comes back with me.

He sits with the agents and then I work off of what they tell me.

At a later point, the Court quoted extensively from the cooperation provisions of the written plea agreement, after which this colloquy occurred:

THE COURT: That is what was mentioned about cooperation. He had been debriefed up until that point; is that correct?

MR. PUSCHECK: Yes.

THE COURT: So it remained for him to do some cooperating prior to my sentencing if I were to consider a lower sentence and if you were to make the motion; is that correct?

MR. PUSCHECK: That's correct.

In a written ruling dated December 11, 2001, the Court denied the motion to withdraw the plea. Focusing on the written motion's assertion that Graves had been

---

**1.** The transcript attributes this paragraph to the Court, as a continuation of something the Court had just said, but the substance of the paragraph makes it clear that it was spoken by Clauss.

assured a sentence of less than 15 years, Judge Telesca ruled that this claim was fully refuted by the written plea agreement and by the colloquy at the time the plea was entered.

The Court subsequently sentenced Graves to 15 years' incarceration and 5 years' supervised release.

Graves, now represented by a sixth attorney, appeals.

## Discussion

■ In denying Graves's motion to withdraw his plea, Judge Telesca understandably focused on Clauss's written allegation that Graves had been advised that his sentence would be less than 15 years. As the Judge concluded, that allegation was refuted by the provisions of the written plea agreement that specified a 15-year sentence. After reviewing the entire record, however, we are persuaded that the Judge took too narrow a view of Graves's claim, and, unfortunately, Clauss, who had not negotiated the plea agreement, did not assist the Court in understanding the point that Graves was trying to make. Graves was not contending simply that he had been assured that he would receive less than 15 years; his point was that he had been assured an opportunity to provide the Government with the substantial assistance that would warrant a 5K1.1 motion, which, in turn, would afford him a reasonable chance to receive a reduced sentence.

The prosecutor's remarks raise a substantial factual issue as to whether Graves's point has merit. First, the prosecutor acknowledged that there was "a 5K aspect" to the plea agreement. Second, the prosecutor acknowledged that somewhere in the discussions that preceded the plea agreement, the topic of what the prosecutor called "proactive cooperation" was considered. Third, the prosecutor acknowledged that this phrase meant an op-

portunity for Graves to work as an informant prior to sentencing, specifically, to be released and to try to purchase narcotics from potential sellers. As he stated, "[T]he information that the [local] police were excited about would have necessitated Mr. Graves being released so that it could be proactive cooperation." As Judge Telesca observed, "So it remained for him to do some cooperating prior to my sentencing if I were to consider a lower sentence . . . ." Fourth, the prosecutor claimed that "[i]t was explained quite clearly to counsel that that was a long shot that he was going to be released, but it was nevertheless a possibility if the information outweighed the risk."

The difficulty is that none of these circumstances was set forth in the written plea agreement, or discussed during the plea allocution. Indeed, the prosecutor has acknowledged that he was not in a position to shed light on exactly what was said about "proactive cooperation" because he did not sit in on the debriefings "so it never comes back to me. [Graves] sits with the agents and then I work off of what they tell me."

■ We appreciate that the written agreement contains an integration clause, explicitly disclaiming the effectiveness of any prior oral representations. And, under usual principles of contract law, oral representations cannot alter the terms of a written agreement. *See United States v. Altro*, 180 F.3d 372, 375–77 (2d Cir.1999). But if Graves was induced to enter into the plea agreement by representations that were made and not intended to be carried out, that sort of improper inducement might well provide a basis for invalidating the agreement, or at least for permitting withdrawal of the plea. *See United States v. Knights*, 968 F.2d 1483, 1488 (2d Cir. 1992).

We cannot be certain what was said about "proactive cooperation," but from the prosecutor's own remarks at the plea allocution, factual issues arise as to whether Graves was led to believe (perhaps by the agents) that he would be released and afforded an opportunity to "make" new cases, and whether the prosecutor intended not to offer that opportunity (by opposing any motion for release).

Of course, all of the uncertainties surrounding this plea could have been avoided if the Government had heeded our prior admonition to include all representations in the written plea agreement. With this admonition disregarded, we feel compelled to return this matter to the District Court for a factual inquiry as to exactly what was said about "proactive cooperation," what understanding was reasonably conveyed to the Defendant concerning the cooperation that would be required for him to have a chance for a reduced sentence and whether he would be released in order to render such cooperation, and whether the Government intended to oppose such release.

Accordingly, the case is remanded to the District Court for a hearing and findings. If, on an expanded record, the District Court elects to permit withdrawal of the plea, the case will proceed in the District Court. If the District Court again denies withdrawal of the plea, then, upon the filing of the District Court's findings, the matter will be automatically restored to our jurisdiction, and this panel will resume consideration of the appeal, in light of the more fully developed record and the District Court's findings. *See United States v. Jacobson,* 691 F.2d 110, 116 (2d Cir. 1982).