17-2868 (L)
United States of America v. Feldman

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: October 29, 2018          Decided: September 17, 2019)

Docket No. 17-2868, 17-2869

―――――――――――――――――――

UNITED STATES OF AMERICA,

*Appellee*,

v.

DORON FELDMAN,

*Defendant-Appellant*.

―――――――――――――――――――

Before:

WALKER, LEVAL, and DRONEY, *Circuit Judges*.

Appeal from the denial by the United States District Court for the Western District of New York (Frank P. Geraci, *J.*), of defendant Doron Feldman's motion to stay and vacate a writ of execution on his retirement account. Held, the district court's reasons for denying Feldman's motions were erroneous. The order of the district court is VACATED and the case REMANDED for factfinding, and reconsideration.

TIFFANY H. LEE, *for* James P. Kennedy, United States Attorney for the Western District of New York, United States Attorney's Office, Rochester, NY,

RANDALL ANDREOZZI, Clarence, NY, *for Defendant-Appellant Doron Feldman*.

LEVAL, *Circuit Judge*:

Defendant Doron Feldman appeals from the September 5, 2017 order of the United States District Court for the Western District of New York (Frank P. Geraci, *J.*), reaffirming an earlier denial of Feldman's motions to stay and vacate a writ of execution on Feldman's retirement account, known as the Great Lakes Account (which had a balance of approximately $1.131 million),[1] and seeking discovery in support of those motions. We conclude that the district court's reasons for its rulings were erroneous. We therefore vacate the court's orders and remand for factfinding and reconsideration of Feldman's motions.

**BACKGROUND**

This appeal raises the question whether, by reason of undertakings and representations made by the government to the defendant in the course of plea negotiations for disposition of a criminal charge, funds forfeited by the

---

[1] In litigation documents, this account has been variously termed the "Great Lakes Anesthesiology Associates PC Retirement Plan," "Great Lakes Anesthesiology," and one of the "Sentinel Accounts." We refer to it as "the Great Lakes Account."

defendant pursuant to his plea of guilty should be credited to his obligation under his sentence to pay restitution to the victims of his offense.[2]

On June 24, 2014, Feldman pleaded guilty to a one-count information which charged him with having conspired with a fellow doctor, identified as "Doctor 1," and Debra Bulter, the Program Administrator of the Department of Anesthesiology of Rochester University, to defraud the University. Feldman's plea was entered pursuant to a plea agreement he made with the Office of the United States Attorney for the Western District of New York ("the Office"). Feldman asserts that, in the negotiations that resulted in the plea agreement, the Assistant United States Attorney ("AUSA") in charge of the prosecution, Richard Resnick, undertook to recommend to the responsible decision-makers in the Department of Justice ("DOJ") that, through a practice known as "restoration," the proceeds of Feldman's forfeiture would be paid to the victims of his crime and would thus reduce the amount of the restitution obligation imposed on him. Feldman further asserts that Resnick, while making clear that DOJ had absolute discretion to reject his recommendation of restoration, nonetheless expressed optimism that it

---

[2] Feldman has not sought to withdraw his plea.

3

would accept the recommendation. Feldman also asserts that, during those plea negotiations, the AUSA was aware of Feldman's Great Lakes Account and its $1,131,000 balance.

The government has not denied Feldman's factual assertions. (Indeed, it has expressly confirmed that Resnick undertook to make the restoration recommendation to DOJ.) The government argues, however, that those facts are irrelevant to the outcome of this appeal for reasons explained below.

Feldman's plea agreement provided that he would plead guilty, would forfeit the proceeds of three specified accounts (not including the Great Lakes Account), which amounted in the aggregate to approximately $1 million, and would pay restitution to the University in the amount of $1,460,000, the entire amount of the loss the University sustained.

The written plea agreement, prepared by the government and signed by the defendant, addressed the question of restoration in somewhat different terms from those attributed by Feldman to AUSA Resnick. It stated that "the government *may, in its discretion, recommend* to the Attorney General" that funds forfeited by Feldman be applied, through restoration, to his restitution obligation:

4

> [I]t is understood by the defendant that the government may, in its discretion, recommend to the Attorney General that any of the forfeited proceeds be remitted or restored to eligible victims of the offense, pursuant to 19 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that the United [States] Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

App'x at 34 (emphasis added). The agreement did not state that the U.S. Attorney *would recommend* restoration; nor did it mention AUSA Resnick's representation of optimism that the recommendation would be accepted. A second pertinent provision, a merger clause, stated:

> This plea agreement represents the total agreement between the defendant, DORON FELDMAN, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

App'x at 35.

The plea agreement was accepted by the district court, and Feldman pleaded guilty on June 24, 2014. On July 1, 2014, the district court entered a

preliminary order of forfeiture, and on October 27, 2014, a final order of forfeiture.

On several occasions after the plea agreement was signed and the plea and the final order of forfeiture were entered, the Office discussed with Feldman its intention to recommend restoration to the Asset Forfeiture and Money Laundering Section of the Criminal Division at DOJ ("AFMLS"), on each occasion making clear that the ultimate decision rested with AFMLS.[3]

In an email to Feldman's attorney on January 21, 2015, AUSA Resnick wrote:

> The amount we have seized [pursuant to the forfeiture ordered by the court] is approximately one million dollars. *I was told that after sentencing, we will submit a formal restoration request package to the money laundering section of DOJ and they will decide how much can go toward restitution. We will ask for all of it and hopefully they will approve.* But we will not know the balance of the restitution amount until they decide, which will be after sentencing. The balance should hopefully be around $460,000. If the restitution is paid after sentencing, then it needs to be paid to the clerk's office. If paid prior to sentencing, it will likely go straight to the [insurer of the victim university].

---

[3] This unit was later renamed the "Money Laundering and Asset Recovery Section." *See* DEPARTMENT OF JUSTICE, EQUITABLE SHARING WIRE (Nov. 16, 2017), https://www.justice.gov/criminal-mlars/file/1018236/download.

App'x at 244 (emphasis added).

In another email to Feldman's attorney, dated January 28, 2015, Resnick said, "I have been advised that while we will request that all of the seized funds be used for restitution, there is no guarantee that DOJ in DC will approve our request. We will make the request after sentencing." App'x at 243.

Feldman pleaded guilty to a separate tax charge on February 18, 2015, pursuant to another plea agreement. Sentencing on both the tax charge and the conspiracy charge took place the same day. Feldman was sentenced to twenty-four months' imprisonment and ordered to pay the restitution specified above (as well as restitution related to his tax offense). The ultimate version of Feldman's presentence report ("PSR"), dated February 11, 2015, which was presented to the court at sentencing, listed among Feldman's assets the $1.131 million Great Lakes retirement account at issue in this case. The previous three versions of the PSR (dated December 24, 2014; January 12, 2015; and January 26, 2015) also listed the Great Lakes Account among Feldman's assets.

At sentencing, AUSA Resnick "comment[ed] on the restitution issue" in the following exchange with the district judge:

> MR. RESNICK: The restitution amount of $1.46 million is to be ordered. The Government – I just wanted to clarify. The Government had seized [though the forfeiture] approximately a million dollars, a little less than a million dollars of Dr. Feldman's assets when this case first started and we were investigating it. Mr. Feldman has recently paid the [victim university] about $467,000. *We anticipate applying the forfeited funds to the restitution amount, if we get the approval from DOJ down in Washington.* But, technically, the restitution has not been paid yet in full. We're hoping that we can get that million dollars in seized funds, you know, applied towards the restitution amount, but we won't know that for probably a month or two.
> THE COURT: That was always the expectation?
> MR. RESNICK: *Yes, that's the expectation. But it has been provided to counsel many times that there's no guarantee, you know, our hands are tied and we have to do what DOJ provides. But we are going to ask that 100% of it be applied towards the restitution amount.*

App'x at 124–5 (emphasis added).

In a letter to AFMLS dated March 4, 2015, another AUSA acting on behalf of the Office, Grace M. Carducci, made the recommendation envisioned in the plea agreement – that Feldman's forfeited funds be applied to his restitution obligation. It appears that, under the Office's division of

responsibilities, AUSA Resnick exercised control over Feldman's prosecution, while AUSA Carducci exercised control over forfeiture matters and AUSA Kevin Robinson, assigned to the Office's Financial Litigation Unit, exercised control over restitution. Carducci's March 4 letter to DOJ expressed the Office's "request that the Chief of AFMLS exercise his/her discretionary authority to authorize the restoration of forfeited property to compensate the victims in the referenced case," and purported to enumerate the "assets owned or controlled" by Feldman. App'x at 430, 432–33. Her enumeration of Feldman's assets, however, was incomplete and did not include the Great Lakes Account.

On August 7, 2015, Carducci, having realized the omission, sent another letter to AFMLS. That letter began as follows:

> Please allow this letter to serve as an addendum to the restoration request that was submitted by my office on March 5, 2015. *We believe the below addendum is vital to the determination of our request, as the additional assets may provide recourse reasonably available to other assets from which the victim may obtain compensation for its loss in this matter. … We have become aware of additional assets* owned or controlled by the defendant, and therefore, supplement … with the information italicized below.

9

App'x at 434 (emphasis added). The letter then listed four Feldman accounts not listed in her prior letter, including the Great Lakes Account. Feldman points out that this letter was inaccurate in its contention that the Office was previously unaware of the Great Lakes Account. He argues that the new letter effectively constituted a revocation of the Office's request for restoration, in stating that the "addendum [listing additional Feldman assets] is vital to the determination of [the] request as the additional assets may provide recourse reasonably available to other assets." App'x at 434.

On November 23, 2015, the Financial Litigation Unit moved for a writ of execution on:

> any and all account(s) in the name of defendant, Doron Feldman . . . , over which the defendant has signatory authority, either directly or as custodian, authorized person, nominee, agent, power of attorney, or through letters of direction, including but not limited to deferred profit sharing plans and individual retirement account(s) held with Sentinel Benefits & Financial Group.

App'x at 143–44. The district court ordered execution on December 1, and the U.S. Marshal shortly thereafter levied upon the Great Lakes Account in the amount of $1,150,475.98. On January 11, 2016, Feldman moved to stay the

execution and levy on the Great Lakes Account. A status conference was then set for March 16, 2016.

Shortly before the conference was set to occur, on March 14, 2016, AFMLS responded to AUSA Carducci's letters. AFMLS denied the request for restoration. It explained:

> Doron Feldman is independently capable of satisfying the restitution order through bank and investment accounts *discovered after the sentencing of Feldman*. According to *Asset Forfeiture Policy Manual (2013), Chap. 12, Sec. I.B.*, a request for restoration should be denied if the victims have recourse reasonably available to other assets from which to obtain compensation for their losses.

App'x at 436 (emphasis added).

At the March 16, 2016 conference, Feldman's counsel told the court that the Office "was aware of the [Great Lakes] pension account," but that AUSA Robinson had informed him that "at the time the restoration request was made to AFMLS [in March 2015] . . . , [AUSA Carducci] . . . wasn't aware that the defendant had this pension account . . . with th[e] $1.1 million valuation[,] [a]nd it was not until [Robinson's] unit began their discovery work on the collection that they discovered the existence of the account." App'x at 159. (If AUSA Robinson made that representation to Feldman's counsel and intended

11

to convey that the Office had been unaware of the Great Lakes Account until Robinson's unit began to investigate subsequent to March 2015, this would unquestionably have been incorrect, as the Great Lakes Account was referenced in the presentence report at least as early as December 2014. Furthermore, the government has not denied Feldman's assertion that the Office was aware of the Great Lakes account during the plea negotiations.)

The government explained to the district court that different attorneys had worked on the prosecution, the forfeiture, and the restitution, and that while AUSA Resnick, who prosecuted the criminal case, may (or may not) have been aware of the Great Lakes Account, AUSA Carducci, who handled the forfeiture, was not aware of it at the time she wrote the March 2015 letter to AFMLS recommending restoration. Carducci stated to the court:

> Rick Resnick did represent with plea negotiations that he would make this restoration request, which I indicated I would do based on the information that I had. Sentencing went forward, and I made th[e] [March 2015] request to AFMLS because I did not know of this additional asset that was in the presentence investigation report. Once I became privy to that information, I am under an obligation to make AFMLS aware of that. So once the PSR was provided to me, I forwarded that information to AFMLS. Once AFMLS found out about that additional account, they denied that request.

12

So Rick Resnick did not hand me that PSR, you know, directly after sentencing. But then I did become aware of it, and as soon as I became aware of that, I passed that information onto AFMLS. . . . Rick Resnick doesn't know what AFMLS requires. I do, that's my job. And to make that restoration request, I'm under a duty to represent to them that the defendant does not have any other assets with which to pay restitution. As soon as I found out about that account from the PSR—and I wasn't at sentencing and didn't prepare for it, that's why I didn't know about it—I wrote [the May 2015] letter to AFMLS and made them aware of that.

App'x at 170.

Feldman's lawyer then asked why Carducci's division had commenced collection actions on the Great Lakes Account before receiving a response from AFMLS. App'x at 173. AUSA Robinson responded that his division, "the Financial Litigation Unit, a totally different unit," was responsible for the restitution process and the writ of execution. *Id.* At the time it attempted to execute the writ, Robinson said, the Financial Litigation Unit "was not aware of . . . a restoration request." *Id.* He explained: "[O]ur unit was simply executing on the judgment issued by the Court which indicated that the defendant owed restitution[,] [a]nd it was only after we made the—we filed the writ that we've become aware of the restoration request." *Id*.

13

Feldman's lawyer (understandably) commented, "Something doesn't make sense here." *Id.*[4]

On August 22, 2016, Feldman moved for discovery. On July 17, 2017, the district court denied Feldman's motion to vacate the writ of execution on the Great Lakes Account, as well as his motion for discovery. Feldman then moved for reconsideration, and on September 5, 2017, the district court reaffirmed its July order and denied Feldman's motion to vacate the writ of execution. Feldman filed this appeal.

**DISCUSSION**

Feldman contends, inter alia, that the government violated its obligations as part of the plea negotiations in at least two ways. First, after AUSA Resnick induced him to plead guilty and consent to forfeiture and restitution by undertaking that the Office would recommend restoration, AUSA Carducci, although initially making the recommendation of restoration, effectively withdrew that recommendation by her letter to AFMLS of August 7, 2015 , which implied that restoration would be inappropriate in view of Feldman's Great Lakes Account, enabling him to pay

---

[4] AUSA Carducci responded, "It does make sense, sir." *Id*.

14

restitution over and above the forfeiture. Second, Feldman contends that the Office made a false or misleading representation when AUSA Resnick expressed optimism that the Office's recommendation of restoration would be accepted by DOJ. If, as AFMLS advised in its March 4, 2016 letter denying restoration, DOJ's governing policy was to deny restoration "if the victims have recourse reasonably available to other assets from which to obtain compensation for their losses," App'x at 436, then the availability of recourse to Feldman's Great Lakes Account effectively foreclosed DOJ's approval of the restoration request, so that the expression of optimism was without reasonable basis and arguably misleading.

The government's response to these arguments has not been to deny the factual assertions on which they are based. Indeed, the government has expressly confirmed that Resnick represented to Feldman that he would recommend restoration. Its position has been rather that Feldman's arguments are irrelevant because (i) the Office's undertaking to recommend restoration was fulfilled by AUSA Carducci's March 4, 2015 letter recommending restoration, (ii) the recommendation was never withdrawn, and (iii) the merger clause incorporated into the plea agreement forecloses

15

Feldman's reliance on Resnick's oral representation of optimism, which is not expressed in the written document.

The district court essentially adopted the government's arguments as its basis for denying Feldman's motions for relief. While noting the government's acknowledgment of having represented to Feldman during the plea negotiations that it would request restoration, the court found that Feldman was not entitled to rely on these representations because "no such promise was included in the written plea agreement and such a promise would be incompatible with the plain language of the agreement that the parties actually entered into." App'x at 423–24. The court further found that even if the Office *had* promised to recommend restoration, it fulfilled any such promise by sending the March 5, 2015 letter to AFMLS, notwithstanding Carducci's August 7, 2015 addendum.

We do not believe this reasoning appropriately resolved the issues. To say that Carducci's March 5 letter made a restoration request, in accordance with Resnick's earlier commitment to do so, and that Carducci's subsequent letter "did not rescind" the request, is overly formalistic. If the fair inference of Carducci's August 7 follow-up letter was to communicate that, because of

16

newly acquired information, the Office no longer believed that restoration was appropriate, the mere fact that the letter did not explicitly state that the earlier recommendation was withdrawn would not bar the court from reading the letter in accordance with its implication. Carducci's August 7 letter went considerably further than merely providing pertinent information. It expressed the view that the information now being provided to AFMLS (about the Great Lakes account) "is vital to [AFMLS's] determination." App'x at 434. The mere fact that Carducci's August 7 letter did not characterize itself as "rescind[ing]" the restoration request does not necessarily mean that it did not effectively do exactly that. It may also be pertinent that Carducci's second letter was arguably misleading in telling AFMLS that "[w]e [i.e., the Office] have become aware of additional assets," App'x at 434, when, in fact, the Office had been aware of the Great Lakes account long before Carducci wrote her letter recommending restoration.

Furthermore, while the district court's analysis might have been compelling with respect to a contract arising out of commercial negotiations among private parties, we believe the court did not correctly apply the standards that govern the interpretation of plea agreements with the

17

government. We have long recognized that plea agreements are significantly different from commercial contracts. *See Innes v. Dalsheim*, 864 F.2d 974, 978 (2d Cir. 1988) ("Comparing a criminal defendant with a merchant in the marketplace is an inappropriate analogy that we have rejected."); *see also U.S. v. Mozer*, 828 F.Supp. 208, 215 (S.D.N.Y. 1993) ("[A] prosecutor entering into a plea bargain agreement is not simply a party to a contract. The [g]overnment is required to observe high standards of integrity and honorable conduct, and the supervisory power of the court is designed to insure that such standards are observed."). Our review of a plea agreement is not limited to its four corners, *United States v. Graves*, 374 F.3d 80, 84 (2d. Cir. 2004), and we construe them "strictly against the government." *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2004). Government conduct in negotiating plea agreements must "comport[] with the highest standard of fairness." *Id*. Because such agreements involve waivers of fundamental constitutional rights, "prosecutors are held to meticulous standards of performance." *Id*. at 153. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S.

257, 262 (1971); *see also United States v. Carbone*, 739 F.2d 45, 46 (2d Cir. 1984)

("[O]nce a plea actually is entered, and was induced by a prosecutor's

promise . . . that promise must be fulfilled.").

"The prosecutor's office is an entity and as such it is the spokesman for

the Government. A promise made by one attorney must be attributed . . . to

the Government." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing

Restatement (Second) of Agency § 272). The Office, like all prosecutor's

offices, carried the burden of "insur[ing] communication of all relevant

information on each case to every lawyer who deals with it." *Id*.

Our relaxed approach to the parol evidence rule in this context applies

even when a plea agreement contains a merger clause. *Graves*, 374 F.3d at 84

(distinguishing between the "usual principles of contract law" for

interpreting an agreement with a merger clause and those applicable for

interpreting plea agreements with a merger clause). In unusual

circumstances, including, but not necessarily limited to, the failure of the

government to negotiate or act in good faith, the merger clause is not ironclad

and we consider the government's oral and written statements in our

interpretive exercise. *Cf. In re Altro*, 180 F.3d 372, 375, 376 (2d Cir. 1999)

19

(refusing to interpret a plea agreement with a merger clause in accordance with a defendant's mere "purported implicit understanding" in the absence of a representation by the defendant that the government had made any statement to induce his understanding).

In part because the district court neither allowed discovery nor conducted an evidentiary hearing, the record does not furnish a basis for a complete understanding of what happened in the course of the plea negotiations and thereafter. Numerous potentially significant questions remain unanswered. Feldman's evidence is sufficient in these circumstances to require of the district court that it take evidence and make findings to determine such questions as whether the merger clause should be strictly enforced in accordance with its terms, whether the Office's undertaking to recommend restoration was fulfilled, whether its expression of optimism that its recommendation of restoration would be accepted was misleading, and whether the defendant is entitled to any relief. We do not know exactly what Resnick said to Feldman concerning the Office's recommendation, what information the Office had requested about Feldman's finances when Resnick said whatever he said, and what information Feldman had furnished at the

20

time Resnick spoke of the possibility of restoration of the forfeiture. These issues may have a bearing on whether the merger clause should be strictly enforced and, if not, whether Feldman is entitled to any relief. We intimate no views as to the answers to these questions.

Nor do we imply in any way that the government is necessarily permanently bound by everything it says in the course of plea negotiations. If, prior to the conclusion of the agreement, the government wishes to retract promises and representations earlier made, it is free to do so. However, unlike civil commercial negotiations among private persons, the government may need to make clear to the defendant that prior commitments have been withdrawn. Depending on the circumstances, the government may not be able to rely exclusively on omissions of prior undertakings and representations from the four corners of the written agreement as effective nullification of them.

For the reasons explained above, we hereby vacate the district court's denial of Feldman's motions to stay and vacate the court's order of execution, and direct the district court to take evidence and reconsider Feldman's

motions, while safeguarding Feldman's and the government's respective interests in the Great Lakes Account.

                            CONCLUSION

The district court's orders denying the defendant's motions to stay and vacate the court's order of execution on the Great Lakes Account are hereby VACATED, and the case is remanded for further proceedings not inconsistent with this opinion.